Opinion issued December 16, 2010



In The

Court
of Appeals

For The

First
District of Texas

————————————

NO. 01-09-00971-CR

———————————

Robert Dion Williams, Appellant

V.

The State of Texas, Appellee



 



 

On Appeal from the 183rd District Court

Harris County, Texas



Trial Court Case No. 1099166

 



 

MEMORANDUM OPINION

          Appellant,
Robert Dion Williams, was charged with capital murder in the course of
committing robbery.  See Tex. Pen. Code Ann. § 19.03(a)(2) (Vernon Supp. 2010).  The
jury found appellant guilty. The State did not seek the death penalty and the
trial judge assessed the mandatory punishment of life imprisonment without the
possibility of parole.  In two points of
error, appellant contends that the evidence is legally and factually
insufficient to sustain a conviction of capital murder.  

We affirm.

BACKGROUND

           Jessica Thorn was complainant Akil Walkes’s
girlfriend. At the time of Walkes’s death, Thorn and Walkes had been dating a
few months.  Walkes sold illicit drugs,
specifically marijuana and codeine. 
Thorn was aware of this and also knew that Walkes personally used
codeine from time to time.  She did not
know if he had used any drugs on the day of his murder.

          Thorn
routinely spent the night at Walkes’s house and had done this for approximately
three months.  One evening in November
2006, Thorn was at Walkes’s house when he received a call on his cell
phone.  He immediately got dressed and
went outside.  Although she was
suspicious that Walkes might have been meeting another woman, Thorn primarily
believed his purpose in going outside was to complete a drug transaction.  After Walkes went outside, Thorn checked his
phone and saw that the call was from someone recorded as “Big Boy.”  She remembered that Walkes had received
several other phone calls that evening, but did not remember any other specific
caller from either of his two phones. 
Thorn next looked out the window and noticed a car, but she did not see
any people and could not identify the car. 
   Shortly after, she returned to bed. 

A short time later, Walkes and
appellant entered the room and sat on the bed. 
Appellant was holding a silver semiautomatic handgun.  Thorn began to cry and appellant yelled at her
to stop.  Appellant then forced Thorn to
give him her money and to look for money under the mattress and through the
drawers in the room.  

Appellant then took Thorn around
the inside of the house, forcing her to look for cell phones and other
property.  While being forced to rummage
around the home, Thorn noticed three other men. 
One man was looking through some DVDs. 
Thorn described him as a short African-American man carrying a long
black gun.  She described the second man
as a tall African-American man.  The
third man was in the living room, where no lights were on, and Thorn was later
unable to describe him.  While in the
living room, Thorn also noticed that the men had moved Walkes to the living
room where he now sat with his arms tied behind his back.

The men subsequently tied her hands
behind her back and forced her and Walkes to the floor.   Appellant repeatedly asked Walkes, “Where is
the rest of it?  I know you have more.”  Walkes replied, “I told you I gave it all to
you.”  Appellant then shot Walkes in the
head and he and the other men fled the scene.

Once the men fled, Thorn was able
to free herself from the braided belt binding her hands.  She first called an ex-boyfriend, Willie Earl
Potts, who was an acquaintance of Walkes and had just been released from prison
on drug charges.  She also called 9-1-1,
remaining on the line with the police until they arrived at the scene.  Subsequently, she called both her mother and
the mother of Walkes’s children.  Both
women came to the scene; Potts did not.

At trial, Thorn testified that
appellant looked like he weighed “maybe two-something” and that there was a big
difference between the way he looked at the time of the murder and the way he
looked at trial, the difference being his increased weight.  Thorn’s descriptions of the other gunmen
included only references to their heights and weights.  

Officer D. Garcia testified that
when he arrived at the scene, “a female [came] running out, screaming and
yelling, waving [her] arms and then [went] back in the house.”  He remembered turning at least one light on,
although he could not recall which light in the house he turned on.  Officer Garcia spoke with Thorn
intermittently and looked around the home, preparing a supplemental report as
part of his investigation.

Officer D. Nunez, a crime scene
investigator with the Houston Police Department’s Homicide Division, testified
that he arrived on the scene at “around 2:29 in the morning.”  Nunez explained that lighting conditions are
often altered by the time of his arrival. 
He collected the belt that Thorn said she had been tied up with, but not
the thermal shirt that Walkes had been tied up with.

Officer E. Aguilera was the crime
scene investigator responsible for fingerprinting.  He did not include in his report which items
he had attempted to lift fingerprints from; however, he did lift a partial
print from the front door of the home. 
Saldivar, an employee of the Houston Police Department’s Identification
Division, Latent Print Section, testified that identification could not be made
based on prints found at the home.

Sergeant E. Carstens testified that
when he arrived on the scene, he spoke with Officer Garcia, and began to
document the scene.  Sergeant Carstens
recovered a .380 shell casing from the living room and noted the bloodstains on
the carpet, a do-rag resting on one of the bloodstains, and the tan braided
belt that was used to restrain Thorn.  He
also found .357 cartridges and 44 rounds of .45 caliber ammunition in the
bedroom.  Carstens collected Walkes’s
cell phone, noting that an outgoing call was made to “Big Boy” at 12:29
a.m.  The phone reflected incoming calls
from “Big Boy” at 12:41 a.m., 1:03 a.m., and 1:12 a.m.  The last two incoming calls were made after
Walkes was shot.  The phone number for
“Big Boy” listed on Walkes’s phone was appellant’s phone number.

Kevin Booker, a close friend of
appellant, testified that he obtained a second line on his cellular service for
appellant’s sole use; the number was the same as that for “Big Boy” in Walkes’s
cell phone.  On the night of the
shooting, records showed that appellant called Booker a number of times
beginning at 12:50 a.m. and ending at 1:44 a.m. 
These calls each show a call time of one minute, and Booker testified
that he could not recall if he and appellant actually spoke. 

 Booker also testified that appellant’s
nickname was “Fro,” that he had heard appellant referred to as “Big Rob,” but
that he had never known him to be called “Big Boy.”  He also provided law enforcement with
pictures of both himself and appellant.  He
testified that appellant never told him to deny knowing him or not to turn over
photographs.

The follow-up investigation was
conducted by Officer J. Bonaby.  As part
of his investigation, he presented photo spreads of appellant and Booker to
Yanetra Chanel Cole (the mother of Walkes’s children), Lashay Walkes (Walkes’s
mother), and Thorn.  Ms. Cole was able to
identify appellant, but not Booker.  Ms.
Walkes identified appellant by the name “Big Boy” and made no identification
when shown Booker’s spread.  Cole and
Walkes also both identified appellant in a large, single photograph.  When shown the photo spread containing
appellant’s photo, Thorn began “shaking and crying and [was] physically just
unable to control herself.”  In position
6, the photograph of appellant, she wrote “this is the guy that I know as Big
Boy, [t]his is the person who shot [Walkes] with a silver handgun.”  Officer Bonaby testified that she
subsequently made the same comment on the single photo, though this was not
included in his report.  Officer Bonaby
also presented each spread to Walkes’s friend, Elmus White, who identified
appellant as “Big Boy” and did not identify Booker. Booker marked appellant’s
name on the photo as “Cuz.”  

Sergeant C. Elliot was the
investigator working with Officer Bonaby. 
He testified that a search for the name “Big Boy” in the Fondren Crime
Analysis Unit (covering the area of the murder) produced several hundred
suspects known as “Big Boy.”  Sergeant
Elliot confirmed that no attempt was made to obtain cell tower records for the
phones on the scene.  Sergeant Elliot was
also responsible for compiling the photo spreads that were shown to the
witnesses.  He explained the process of
putting together these spreads and explained that the reason for not shuffling
the position of pictures from witness to witness was a tenfold increase in
probability of making an error.

M. Feeney, an assistant medical
examiner for Harris County, performed the autopsy in the case.  She did not note any marks on either Thorn or
Walkes that would indicate that they had been tied up.  She did confirm that Walkes had PCP in his
system at the time of his death and that he had “various non-specific
scars.”  Feeney testified that cause and
timing of an injury cannot be determined from a scar alone, but she confirmed
that it was possible that a bullet had grazed his head, leaving a scar, four or
five months prior to his death.

Dr. Gahn, Forensic Biology DNA and
Trace Section supervisor at the Houston Police Department Crime Laboratory, was
responsible for supervising the testing of DNA samples from the braided belt
with which Thorn was tied.  She testified
at trial that she took a scraping sample and a swabbing sample from the belt.  She further testified that appellant’s DNA
was not present on the scraping sample, and that the swabbing sample could
neither confirm nor exclude appellant as a contributor.

Lashay Walkes also testified at
trial.  Walkes had lived with her at the
time of his death, but his mother spent many nights in Missouri City with her
boyfriend.  Lashay testified that she had
been under the impression that Walkes worked at a detail shop and did not know
that he dealt drugs.  Lashay testified
that she did not remember Thorn spending the night at her home.  She said that she did remember seeing
appellant at the house, but that she was never introduced to him.  She also testified that Elmus White was at
the house frequently.

Heather Barker is a Human Resources
Director at Noble Logistics Inc, where appellant began working shortly after
the murder.  She is the custodian of
records at Noble and confirmed appellant’s phone number via his job application.  Barker testified that she recognized
appellant because appellant had visited his mother, who also worked there,
prior to his employment with the company. 
However, the defense counsel pointed out at a bench conference that it
was impossible for this to be true because appellant was arrested and confined
before Barker began working at Noble. 
She stated in the presence of the jury that she was mistaken when she
identified appellant in court.

SUFFICIENCY OF THE EVIDENCE

In two issues, appellant contends that
the evidence is both legally and factually insufficient to sustain a conviction
of capital murder.  

A.      Standard of Review

An appellate court reviews both legal and factual sufficiency
challenges using the same standard of review. 
Brooks v. State, No. PD-0210-09, 2010 WL 3894613, at
*14, 21–22 (Tex. Crim. App. Oct. 6, 2010); Ervin
v. State, No. 01-10-00054-CR, 2010 WL 4619329, at *3 (Tex. App.—Houston
[1st Dist.] Nov. 10, 2010, no pet. h.).  Under this standard, evidence is insufficient to support a conviction
if, considering all the record evidence in the light most
favorable to the verdict, no rational fact finder could have found that each
essential element of the charged offense was proven beyond a reasonable
doubt.  See Jackson v. Virginia,
443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); Laster
v. State, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App.
2007).  Viewed in the light
most favorable to the verdict, the evidence is insufficient under this standard
in two circumstances:  (1) the record
contains no evidence, or merely a “modicum” of evidence, probative of an element
of the offense; or (2) the evidence conclusively establishes a reasonable
doubt.  Laster, 275 S.W.3d at 518; Williams, 235 S.W.3d at 750.

If an appellate court finds the evidence
insufficient under this standard, it must reverse the judgment and enter an
order of acquittal.  See Tibbs v. Florida, 457
U.S. 31, 41–42, 102 S.Ct. 2211, 2218 (1982). 
An appellate court determines
whether the necessary inferences are reasonable based upon the combined and
cumulative force of all the evidence when viewed in the light most favorable to
the verdict.  See Clayton v. State, 235 S.W.3d 772, 778 (Tex. Crim.
App. 2007).  An appellate court presumes that the fact finder
resolved any conflicting inferences in favor of the verdict and defers to that
resolution.  See Jackson, 443 U.S. at 326, 99 S.Ct. at 2793; Clayton, 235 S.W.3d at 778.  An
appellate court may not re-evaluate the weight and credibility of the record
evidence and thereby substitute its own judgment for that of the fact
finder.  Williams, 235 S.W.3d at
750.

B.      Capital
Murder

Under the law applicable to this
case, a person commits the offense of capital murder if he intentionally or
knowingly causes the death of an individual in the course of committing
robbery.  See Tex. Pen. Code Ann. § 19.03(a)(2) (Vernon Supp. 2010); Tex. Pen.
Code Ann. § 19.02(b)(1) (Vernon 2003).  It is well established that the testimony of
a single eyewitness can be legally sufficient to support a conviction.  Davis
v. State, 177 S.W.3d 355, 359 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing Aguilar v. State, 468 S.W.2d 75,77 (Tex. Crim. App. 1971)).  

C.      Sufficiency
Analysis

Here, the testimony of Thorn alone
is enough to support conviction.  Thorn
identified appellant from a photo spread as “the guy I know as Big Boy, [t]he
person who shot [Walkes] with a silver handgun.”  Thorn provided a narrative for the jury of
the night of the incident, including the events leading up to and surrounding
both the robbery and Walkes’s murder. 
During her description of the events, Thorn identified appellant in the
court room as the man who murdered Walkes. 
Thorn noted at trial that she was able to “get a good look at
[appellant’s] face” and that “he had a gun facing towards [her].”  When describing Walkes’s murder, she noted
she clearly saw appellant when he shot Walkes. 
She further noted that appellant made Walkes lie on his stomach, and
that she saw appellant shoot Walkes in the head when Walkes told appellant that
he had no more drugs to give appellant. 
When asked by the State, “[d]id you see the defendant shoot [Walkes],”
appellant responded affirmatively.  She
also noted that appellant shot Walkes with the silver handgun that she had seen
him with earlier.  Appellant makes the contention
that there were inconsistencies in Thorn’s statements; however, we must defer
to the jury to decide the credibility of her testimony.  See
Petro v. State, 176 S.W.3d 407, 412 (Tex. App.—Houston [1st Dist.] 2004, pet. ref’d).

Evidence also indicates that the
murder was drug-related.  See Guevara v. State, 152 S.W.3d 45, 50 (Tex.
Crim. App. 2004) (motive is significant circumstance indicating guilt).  Thorn testified at trial that it was her
perception that appellant was looking for drugs when he robbed Walkes.  Additionally, immediately prior to shooting
Walkes, appellant demanded “Where is the rest of it?  I know you have more.  Where is the rest of it?”  Thorn’s testimony indicates that the purpose
of Walkes’s initial interaction with appellant was drug related.  It further indicates that appellant was
looking for drugs when he robbed and murdered Walkes.  

Viewing all evidence in the light
most favorable to the verdict, the evidence shows that a jury could reasonably
find beyond a reasonable doubt that appellant knowingly caused the death of
another while in the course of committing robbery.  Thus, the evidence is legally
sufficient.  See Davis, 177 S.W.3d at 359 (holding testimony by one witness can
be legally sufficient to support conviction). 


We overrule appellant’s first and
second issues.




 

CONCLUSION

We affirm the judgment of the trial court.

 

                                                                   Sherry
Radack

                                                                   Chief
Justice 

 

 

Panel consists
of Chief Justice Radack and Justices Massengale and Mirabal.[1]

 

Do
not publish.   Tex. R. App. P. 47.2(b).

 

 











[1]           The
Honorable Margaret Garner Mirabal, Senior Justice, Court of Appeals for the
First District of Texas, participating by assignment.